**UNITED STATE DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

BERTHA BARRIOS,                          )
                                         )
                    Plaintiff,           )
                                         )        No. 06-CV-06968
v.                                       )
                                         )        The Hon. Michael T. Mason
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff Bertha Barrios ("Barrios" or "claimant") filed a motion for summary

judgment seeking judicial review of the final decision of the Commissioner of Social

Security (the "Commissioner") denying her claim for disability insurance benefits under

the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i), 423(a)(1) and (2)(A), and

1382c(a)(3)(A).  The Commissioner filed a cross-motion for summary judgment asking

this Court to uphold the decision of the Administrative Law Judge ("ALJ").  This Court

has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g).  For the reasons set

forth below, Barrios' motion is granted in part and denied in part, the Commissioner's

motion is denied, and this case is remanded for further proceedings consistent with this

opinion.

**I.       BACKGROUND**

    **A.      Procedural History**

         Barrios filed an application for benefits on June 28, 2004, alleging a disability

onset date of September 11, 2003 and a primary diagnosis of osteoarthrosis.  (R. 29,

73-75). She subsequently amended her onset date to May 20, 2004. (R. 98). Claimant's application was initially denied on November 18, 2004, and again on April 12, 2005, after a timely request for reconsideration. (R. 30, 39). Barrios requested a hearing, which was held on July 19, 2006 before ALJ Richard J. Boyle ("ALJ Boyle"). (R. 393-422). ALJ Boyle issued a written decision denying Barrios' claim for benefits on August 24, 2006. (R. 9-15). The Appeals Council denied Barrios' request for reconsideration on October 19, 2006, and ALJ Boyle's decision became the final decision of the Commissioner. (R. 5-7); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998). Barrios subsequently filed this action in the District Court.

### B.     Medical Evidence

Barrios submitted various medical records in support of her claim for benefits, including those from her primary care physician Dr. John A. Benages ("Dr. Benages"), who treated claimant at the Elmhurst Clinic Center for Health (the "Elmhurst Clinic"). (R. 258-341, 370-90). Barrios' medical records also include a cervical spine x-ray performed on November 9, 2001, prior to the alleged onset of her disability. (R. 257). According to the reviewing radiologist, the x-ray showed "mild uncinate hypertrophy at C4-C5 which minimally narrows the C5 formina" and "mild end-plate remodeling at C6-C7 suggesting early disc degeneration." (*Id.*). An MRI of Barrios' cervical spine, taken on December 13, 2001, revealed mild generalized bulging and/or desiccated discs at C3-C4, C4-C5, and C5-C6. (R. 254). After reviewing the MRI results, a radiologist from the Elmhurst Clinic diagnosed claimant with cervical spondylosis. (*Id.*).

Dr. Benages saw Barrios on September 5, 2003. (R. 338). At that time, Barrios complained of pain across her shoulders, hands, and right knee. (*Id.*). Dr. Benages

2

reviewed Barrios' rheumatologic work up, which he found to be within normal limits. (*Id.*). He opined that claimant may have degenerative joint disease and generalized osteoarthritis, and prescribed 20 mg of Bextra daily. (*Id.*). The doctor also noted that Barrios "asked to have a reduction in work hours in an attempt to see if reduction in hours and work capacity would ameliorate some of her multiple rheumatic and arthritic complaints. A note was written." (*Id.*). Finally, Dr. Benages noted that Barrios "is considering social security disability application . . . she does not feel because of her generalized osteoarthritis that she is able to continue working in her present capacity." (*Id.*). Barrios returned to Dr. Benages on October 10, 2003, and again indicated that she was considering applying for disability benefits. (R. 337).

On November 14, 2003, Barrios sought treatment for epigastric abdominal pain associated with her continued use of Bextra. (R. 331). Dr. Benages also noted Barrios' complaints of significant pain in her neck and across her bilateral trapezial ridge. (*Id.*). However, Dr. Benages did not believe that Barrios was disabled:

> She has not returned to work, and she states that she has received notice from her employer that as of December 14, 2003, if she does not return to work, they will take away her health insurance coverage. I asked the patient point blank if she was planning on returning to work, and she stated emphatically that she was not. She has applied for disability long-term benefits, but in my estimation I don't feel that the patient is clinically disabled.

(*Id.*). Dr. Benages discontinued Barrios' Bextra, prescribed Aciphex and Darvocet, and referred her to the Elmhurst Pain Management Center (the "Pain Center"). (*Id.*).

Barrios began receiving treatment from Dr. M.P. Zygmunt ("Dr. Zygmunt") at the Pain Center on December 4, 2003. (R. 245-47). In his initial evaluation, Dr. Zygmunt noted claimant's history of cervical and low back pain, arthritis dating back to the mid-

1990's, and fibromyalgia. (R. 245). He also noted that claimant's medical history revealed "extensive" investigation of the pain in her right shoulder and upper thoracic area, no epidural steroid injections, no previous surgery, physical therapy, and "modest" amounts of analgesic medication. (*Id.*). Upon examination, Dr. Zygmunt found that claimant had decreased flexion and extension in her cervical spine. (R. 246). He devised a treatment plan of continued analgesic medications and muscle relaxants, epidural steroid injection therapy, and oral injected steroids. (*Id.*). Dr. Zygmunt prescribed Medrol Dosepak, Vicodin, Flexeril and continued physical therapy, and elected to defer epidural steroid injections in order to evaluate the results of changes to Barrios' medication regimen. (*Id.*).

Barrios returned to the Pain Center for follow-up on December 22, 2003 and reported a 50% decrease in her pain symptoms. (R. 234). At that time, Dr. Zygmunt treated claimant with a cervical epidural steroid injection of 80 mg Depo-Medrol at C5-C6. (*Id.*). He recommended that Barrios continue treating her pain with Vicodin and physical therapy and return in two weeks for follow-up care. (*Id.*). Barrios did not return to the Pain Clinic until April 6, 2004. (R. 227).

Also on December 22, 2003, Barrios sought treatment from Dr. Benages in order to discuss "possible medical leave of absence because of multiple arthritic complaints in her neck, shoulder, and low back, and now her right hip." (R. 325, 392). Barrios reported that she is unable to return to active work and full duty, and had been advised to apply for disability benefits. (*Id.*). Dr. Benages provided claimant with a note for her employer stating that he "deem[ed] her totally disabled from this point on." (*Id.*). Barrios called Dr. Benages' office to request paper work showing her disability on February 9,

4

2004 and again on February 20, 2004. (R. 299, 339).

During a March 30, 2004 office visit, Dr. Benages noted that Barrios had received multiple trigger point and epidural steroid injections at the Pain Center. (R. 298). She complained of neck pain and headaches, and requested a follow-up visit to the Pain Center. (*Id.*). Due to claimant's persistent symptoms and severe headaches, Dr. Benages ordered a follow-up MRI of her head and cervical spine. (*Id.*).

On April 6, 2004, Barrios returned to the Pain Center for treatment of her neck and shoulder pain. (R. 227). She requested that Dr. Zygmunt change her pain medications because "Flexeril causes a headache and [she] does not like how she feels with Vicodin." (*Id.*). Dr. Zygmunt recommended a TENS (transcutaneous electrical nerve stimulation) unit and physical therapy, and continued claimant's prescription for Darvocet. (*Id.*).

Three days later, on April 9, 2004, Dr. David Wasserman ("Dr. Wasserman") performed the follow-up MRI ordered by Dr. Benages. (R. 222-24). The MRI revealed mild-to-moderate degenerative arthritic changes with mild spinal stenosis from C3-C4 through C6-C7. (R. 222). Dr. Wasserman compared the MRI to claimant's December 13, 2001 MRI, and concluded that "there has been little change." (*Id.*).

Barrios received physical therapy through Elmhurst Memorial Hospital. (R. 205-20). On April 26, 2004, Jose Camara ("PT Camara") completed an initial evaluation and treatment plan. (R. 205-08). PT Camara found that Barrios had a "fair" rehabilitation potential, and outlined a four-week treatment plan. (R. 205). He noted that "[t]he patient's symptoms and findings are likely non-mechanical in nature as symptoms are unchanged with movement or changes in position." (*Id.*). After four weeks of physical

therapy, Barrios reported that her "symptoms have remain[ed] the same, and [she] only gets temporary reduction of symptoms while using her home TENS unit." (R. 209). Claimant continued to rate her symptoms at 9/10 "at worst." (*Id.*). On May 20, 2004, PT Camara found that, with the exception of improved postural awareness, Barrios' physical therapy goals had not been met, and discharged her from physical therapy due to a lack of progress. (*Id.*).

On April 29, 2004, Dr. J. Thomas Brown ("Dr. Brown"), a neurosurgeon at the Chicago Institute of Neurosurgery and Neuroresearch, provided treatment to Barrios. (R. 345). According to Dr. Brown's notes from that visit, he first treated Barrios in January 2002. (*Id.*). During that visit, Barrios reported that her symptoms began in April 2001, following a motor vehicle accident. (*Id.*). The doctor recommended physical and occupational therapy, and counseled Barrios to consider a series of epidural steroid injections. (*Id.*). He felt there were no "hard indications" for surgery on claimant's cervical spine at that time. (*Id.*). Dr. Brown continued to see Barrios through April 2002, at which time her only treatment had been "analgesics as needed, though she was not taking them on a daily basis." (*Id.*).

Although he recommended further evaluation, Barrios did not return to Dr. Brown until April 29, 2004. (R. 346). At that time, she reported headaches that "extend to the top and back of her head and then go down her spine." (*Id.*). Claimant told Dr. Brown that she's had these headaches since 1990, but they've increased in the past two weeks. (*Id.*). She also reported neck pain that can extend into both arms, although more on the right; diffuse weakness in her arms; numbness and tingling in her hands; and pain in her right leg, knee joints, feet, and big toes. (*Id.*). Barrios told Dr. Brown

that she received one cervical epidural steroid injection after her last visit with him two years ago, but it did not help and she did not return for other injections.  (*Id.*).

Dr. Brown opined that Barrios "appears to be depressed."  (R. 346).  He performed a cranial nerve exam, which was normal with no papilledema.  The doctor found claimant's neck range of motion "about 75% normal in all directions with increased neck pain on all movements," and "diffuse tenderness and tightness in and about the cervical region."  (*Id.*).  On direct testing, Barrios' strength and sensation in her upper extremities were normal.  (*Id.*).  Dr. Brown recommended an MRI of the brain and prescribed Neurontin to treat Barrios' pain.  (R. 346-47).

On May 8, 2004, Barrios had an MRI of her brain performed at Elmhurst Memorial Hospital.  (R. 199-203).  According to the reviewing radiologist, the MRI revealed "[s]everal tiny non specific foci of increased T2 and FLAIR signal within the deep cerebral and subcortical white matter of the frontal lobe" that are "non specific and may be early manifestations of chronic small vessel ischemic changes versus chronic sequela of vascular type headaches."  (R. 199-200).  On May 10, 2004, Dr. Brown noted that the MRI was "normal."  (R. 347).

Barrios returned to Dr. Benages for treatment on May 20, 2004 and reported continued neck and shoulder pain.  (R. 297).  Dr. Benages noted that Dr. Brown "offered no surgical options" and there was "nothing that he could do for the patient neurosurgically."  (*Id.*).  Dr. Benages observed that previous cervical epidural steroid injections did not provide significant long-standing relief, and Barrios' symptoms have actually worsened.  (*Id.*).  Claimant refused any further cervical epidural steroid injections.  (*Id.*).  Dr. Benages opined that "Darvocet no longer controls [Barrios'] pain. .

. . Her condition is slowly deteriorating. I do not fee[l] patient is able to return to work nor do I feel she is going to be able to return to work in the near future." (*Id.*). On June 4, 2004, Dr. Benages sent a note to Barrios "to continue to be off from work on permanent disability." (R. 296).

Claimant returned to Dr. Brown for a follow-up visit on the June 15, 2004. (R. 343-44). Dr. Brown's notes state:

> [Barrios'] daughter brings her back here today apparently due to a dispute over whether or not she is able to work. A letter from her employer dated June 9th indicates that upon review of my office note from April 29th it 'appears' she would be able to return to work without restrictions. I have never made a determination of her ability to work. . . . Her only medication is Darvocet as needed. Again, I feel she should be treated in the [Pain Center] not neurosurgically. I think the only fair way to assess her work status is to have her undergo a functional capacity evaluation and then return to work based on those findings.

(R. 344).

Claimant returned to Dr. Benages for further treatment on June 25, 2004. (R. 293-94). After reviewing Dr. Brown's treatment notes, Dr. Benages noted that a functional capacity evaluation had not been performed because "patient is on public aid and [it] does not perform or authorize cover [for] functional capacity evaluations." (R. 294). Dr. Benages also noted that "patient is medically disabled and unable to return to her previous employment status." (*Id.*). He referred Barrios to Dr. Stanley Fronczak ("Dr. Fronczak") for a second neurosurgical opinion. (*Id.*). The record does include any records from Dr. Fronczak and claimant did not identify him as one of her doctors. (R. 158).

Barrios received treatment at the Elmhurst Clinic on September 3, 2004 from Dr. Matthew J. Spiewak ("Dr. Spiewak") for back pain. (R. 291). The doctor examined

claimant and found "no neurologic deficits in the lower extremities," although he did note claimant's poor hamstring flexibility. (*Id.*). Dr. Spiewak recommended that claimant continue taking Vicodin for her neck pain at night, and added Flexeril three times daily for the next week. (*Id.*). Claimant returned to the Elmhurst Clinic on September 16, 2004, complaining of chest pain over the past several months. (R. 290). Dr. Benages ordered a stress echocardiogram to "rule out the remote possibility of ischemic heart disease." (*Id.*). Barrios' stress echocardiogram results were normal. (R. 289).

On October 18, 2004, Dr. Ibrahim Sadek ("Dr. Sadek") examined claimant on behalf of the Bureau of Disability Determination Services. (R. 348- 50). Dr. Sadek found that claimant had full range of motion of her neck, with stiffness on lateral tilt bilaterally. (R. 349). He also found that claimant had full range of motion of her shoulders, elbows, wrists, hips, knees and ankles; upper extremities motor strength of "3-4/5 bilaterally including handgrip and finger pinch;" and a lower extremities motor strength of 4-5/5 bilaterally. (*Id.*). Dr. Sadek administered a straight leg raising test that revealed low back pain and discomfort at 65 degrees bilaterally. (R. 350). He also found that claimant had a normal gait and a 75 degrees spinal range of motion flexion. (*Id.*). He diagnosed Barrios with cervical radiculopathy and osteoarthritis of the cervical spine. (*Id.*). The doctor opined that Barrios' suffered from "degenerative joint disease affecting the cervical spine area, with neck pain radiating to both arms and weakness to both hands [that] is also causing her headaches." (*Id.*).

On November 3, 2004, Dr. Pilapil Virgilio ("Dr. Virgilio") performed a Residual Functional Capacity ("RFC") assessment based on a primary diagnosis of osteoarthritis and cervical spine spondylosis. (R. 352-59). Dr. Virgilio opined that Barrios had the

RFC to occasionally lift and carry up to twenty pounds; frequently lift and carry up to ten pounds; sit, stand, or walk for up to six hours in an eight-hour work day; and push or pull without limitation. (R. 353). She could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 354). Dr. Virgilio also found that Barrios did not have any manipulative, visual, or communicative limitations. (R. 354-56). Finally, Dr. Virgilio opined that Barrios had the RFC to perform light work. (R. 359).

Barrios returned to Dr. Benages on December 3, 2004 and complained of low back pain radiating down her right leg. (R. 270). Dr. Benages noted that someone at Elmhurst Hospital diagnosed claimant with sciatica on December 1, 2004. (R. 270, 176). Dr. Benages prescribed Neurontin and Propoxyphene to treat Barrios' pain. (*Id.*).

On December 13, 2004, claimant sought treatment from Dr. Nirali J. Ghia ("Dr. Ghia"), a gynecologist at Elmhurst Memorial Hospital, for persistent pelvic pain. (R. 169-75). Claimant declined a hysterectomy at that time. (R. 170). Dr. Ghia performed a diagnostic laparoscopy of Ms. Barrios' abdomen which revealed no obvious signs of endometriosis or adhesions in the pelvic cavity. (R. 171-72).

During a visit to Dr. Benages' office on January 11, 2005, Barrios complained of continued neck pain and resulting inability to sleep. (R. 266). Dr. Benages noted that claimant remained unsatisfied with Dr. Brown, and had been referred to Loyola University Medical Center for further opinion. (*Id.*). He also noted that the Social Security Administration denied Barrios' claim for disability benefits. (*Id.*). Dr. Benages discontinued claimant's prescription for Darvocet and replaced it with Ultracet. (*Id.*). However, Dr. Benages refilled claimant's prescription for Darvocet on February 2, 2005. (R. 265). During a May 16, 2005 office visit, Dr. Benages discussed claimant's lab

10

results, which were generally normal, and again refilled her prescription for Darvocet. (R. 389).

At the request of Dr. Benages, claimant had an x-ray of her right hip on June 14, 2005. (R. 385-87).  Prior to ordering the x-ray, Dr. Benages noted Barrios' continued complaints of right hip and groin pain, particularly on ambulation, and report that "the quality of her life has significantly been negatively impacted."  (R. 385).  He observed that claimant has been on chronic long-term non-steroidal anti-inflammatories and is currently on Darvocet and Ultracet "without any significant relief of symptoms."  (*Id.*).  According to the reviewing physician, the x-rays revealed mild degenerative change to claimant's right hip, with osteophytosis, and no acute osseous abnormality.  (R. 387)

On November 1, 2005, Dr. V. Stambolis ("Dr. Stambolis") performed an electromyogram ("EMG") study of claimant.  (R. 377-83).  Dr. Stambolis concluded that the EMG results were normal.  (R. 377).  Claimant's medical records also include the results of an abdominal x-ray taken on January 7, 2006.  (R. 371-75).  With the exception of mild gastroesophageal reflux, the results were unremarkable. (R. 371).

### C.     Claimant's Testimony

Barrios appeared and testified at the hearing. (R. 398-413). Barrios was born in Mexico on August 26, 1953 and is a United States citizen.  (R. 398).  Barrios attended school in Mexico through seventh grade. (R. 399).  Barrios understands and speaks some English,[1] but cannot read English or perform simple arithmetic. (R. 396, 399). She is five feet, four inches tall and weighs approximately 180 pounds.  (*Id.*).  Barrios is

─────────────────────

[1]Barrios testified through an interpreter. (R. 395).

divorced and lives with her daughter.  (R. 398).

Barrios testified that she was in pain during the hearing, and that the pain began in her neck and radiated down her arms to her fingers. (R. 402).  According to claimant, her neck pain "has been [there] three years . . . or more than three years."  (R. 403).  When asked if her pain is the result of an automobile accident, claimant replied "I do not think that is the reason because they say it is arthritis."  (*Id.*).  Claimant stated that her neck pain "hardly ever goes away.  Sometimes one day it might go away a tiny bit, but usually it doesn't let me sleep."  (*Id.*).  Barrios testified that the neck pain moves into her arms and then she's "not able to put my undergarments on because it hurts too much. . . . Both shoulders hurt too much."  (*Id.*).  She stated that the pain is also in her wrists, "sometimes in the fingers" and "everywhere."  (*Id.*).  Barrios also stated that "sometimes" her hands fall asleep and her fingers tingle and "fall asleep especially at night a lot."  (R. 403, 405).

When asked if she has pain in her back, Barrios stated that she has it "all over." (R.  404).  "The one on the back started when the pain here in my neck started . . . it has been a while."  (*Id.).*  The pain tends to travel from Barrios' neck to her lower back. (R. 404-05).  Barrios testified that her knees began to hurt around the same time her back started to cause her pain.  (R. 405).  She has pain in her legs that travels down to her toes and causes her feet to tingle.  (R. 405).

Barrios stated that Dr. Benages is her primary doctor.  (R. 410).  She recalled receiving therapy at the hospital "for the arm, the back and the leg."  (R. 405).  However, the therapy "is not helping . . . any more so they said for [her] to not go any more."  (R. 405-06).  Barrios stated that when she visits her doctor, "he can only give [her]

medication that there's nothing he can do."  (R. 406).  According to Barrios, her doctors have not recommended surgery, "[t]hey only gave me an injection in my neck to see if it would help, but it did not help."  (R. 408).

ALJ Boyle questioned Barrios regarding the medications used to treat her pain. (R. 409).  Barrios denied taking Ibuprofen, but "thinks" she has taken Propoxy. (*Id.*). Barrios recalled taking Tylenol for her arthritis, but stated "the truth is I do not remember what they're called the ones I take." (R. 409-10).  Barrios occasionally uses a hot pad for her pain. (*Id.*).

Barrios becomes "very tired" when standing and "can only b[are] half an hour about."  (R. 406).  She can walk about two blocks, but if she has to walk "for a while" her feet hurt.  (*Id.*).  She does not use a cane.  (R. 409).  Barrios stated that she has difficulty performing household tasks including climbing stairs, vacuuming, doing laundry, mopping, and cooking. (R. 407).   She also testified that she is able to lift a bag of groceries "[i]f it's less than 15 pounds, one time."  (R. 407).  Sometimes while cooking Barrios will grab a plate and "the pain is so strong, [she] feel[s] that [she] might drop it." (R. 404).  Barrios stated that she has a seven-day-old grandson and will not carry or lift him because she's afraid he may fall.  (*Id.*).

Barrios testified that she has "always" worked. (R. 402).  Barrios worked on the line at the Pampered Chef factory for approximately four years.  (R. 400).  That job required claimant to pack materials into a box.  (*Id.*).   She spent most of her work day on her feet, and had to lift up to twenty or twenty-five pounds.  (*Id.*).  Barrios did not supervise any employees while working at Pampered Chef.  (*Id.*).  She also worked on the assembly line at Whisco Component Engineering ("Whisco").  (R. 400-01).  While at

13

Whisco, claimant had to lift between five and ten pounds, stand "[m]ost of the time," and bend on occasion. (R. 401). Barrios also operated an injection molding machine at an unnamed plastic company. (*Id.*). This job required Barrios to stand throughout the work day and lift approximately fifteen to twenty pounds. (R. 402).

### D. Medical Expert's Testimony

Dr. Roland Manfredi ("ME Manfredi") testified as the medical expert at Barrios' hearing. (R. 413-421). ME Manfredi reviewed Barrios' medical records prior to the hearing, and opined that they are "adequate." (R. 413). He testified that the records show that Barrios has received "extensive medical care over the years for various pain problems . . . in her neck and her lower back and her arms and in her legs." (R. 413). ME Manfredi observed that claimant has seen a number of specialists, including orthopedic surgeons, neurosurgeons, internists, a cardiologist, and an ear, nose and throat specialist. (*Id.*). He further observed that Barrios has undergone a number of tests and "most of [those] tests came back negative." (*Id.*). However, he did note that an MRI showed "some changes," specifically arthritic narrowing of the foramina between L3-4 and L5-6 that claimant's doctors attempted to treat with steroids and procaine. (*Id.*). He testified that claimant "did not get any satisfactory relief" from that course of treatment. (*Id.*). In response to a question from claimant's attorney regarding a possible compression of Barrios' left S1 nerve, ME Manfredi testified that Barrios "could have the pain from it. . . . It would have been nice to have support from the EMG which looked pretty good on that test." (R. 419). He further noted that "if the surgeons, the neurosurgeons and the orthopds were impressed with that finding, they might have gone after it, but that was not the case." (R. 420).

14

ME Manfredi classified Barrios' condition as a spinal disorder Listing 1.04.  (R. 414).  However, because he did not see any evidence of nerve damage from that spinal disorder, ME Manfredi concluded that Barrios' condition does not meet the requirements of Listing 1.04.  (*Id.*).  ME Manfredi opined that Barrios does not have any functional limitations related to her back problems, although she does suffer from pain. (R. 414).  ME Manfredi observed that claimant's doctors tried an intensive course of physiotherapy and treated claimant with various pain medications, including Tylenol and Neurontin. (R. 413-14).  He testified that "much as the doctors tried to give her some relief, they were not successful."  (*Id.*).

When asked if claimant's pain complaints were reasonable based on the medical record, the ME noted that they're "quite generalized" and "probably coming from her spine."  (R. 415).  He classified claimant's pain problems as "mild at best on examination, and she gets relief strictly from medication."  (*Id.*).  However, he agreed that it's "not improbable" that claimant's "pathology could produce the symptoms to the extent she's alleging."  (R. 420).  ME Manfredi also pointed out that none of claimant's treating physicians recommended surgery, and that they continue to prescribe medication to treat her pain.  (R. 414).  ME Mandfredi concluded that this is because claimant has no "significant abnormalities to correct."  (*Id.*).

With regard to claimant's functional abilities, the ME noted that "they did evaluate her and they said she should not lift more than 20 pounds, and she can frequently lift up to ten pounds, and she can stand up to six hours in a day, and sit up to six hours a day, and not do any kneeling or climbing activities."  (R. 415).  ME Manfredi agreed with these limitations.  (*Id.*).  He opined that Barrios could work with the following limitations:

no lifting more than twenty pounds, no climbing, and no kneeling.  (*Id.*).  ME Manfredi

found that Barrios can frequently lift up to ten pounds and that she could sit or stand for

up to six hours a day.  (*Id.*).

## II.    LEGAL ANALYSIS

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial

evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d

936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence and

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v.

Perales*, 402 U.S. 389, 401 (1971)).  We must consider the entire administrative record,

but we will not "reweigh the evidence, resolve conflicts, decide questions of credibility,

or substitute our own judgment for that of the Commissioner."  *Lopez v. Barnhart*, 336

F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.

2001)).  Rather, we will "conduct a critical review of the evidence" and not let the

Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion

of the issues." *Id.* at 539.

### B.    Analysis Under the Social Security Act

A claimant's ability to receive disability insurance benefits depends on whether

the claimant is "disabled" under the Social Security Act.  A person is disabled under the

Act if "he or she has an inability to engage in any substantial gainful activity by reason of

a medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423 (d)(1)(A).

In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment whether [she] can perform [her] past relevant work, and (5) whether the claimant is capable of performing work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden shifts to the Commissioner. *Id.* at 886.

ALJ Boyle followed this five-step analysis. At step one, the ALJ found that claimant has not engaged in substantial gainful activity since May 20, 2004. (R. 12). Next, ALJ Boyle found that Barrios suffers from two severe impairments, spinal arthritis and gastroesophageal reflux disease ("GERD"). (R. 13). At step three, the ALJ found that Barrios' impairments do not meet or equal any Listing requirement. (*Id.*). The ALJ then determined that Barrios has the RFC to lift or carry twenty pounds occasionally, lift or carry ten pounds frequently, stand or walk for six hours during an eight-hour work day, and sit for at least two hours in an eight-hour work day. (*Id.*). He further found that claimant's medically determinable impairments could reasonably be expected to produce some of her alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms are not credible. (R. 14). The ALJ then found, at step four, that claimant is capable of performing her past

17

relevant work as a machine operator, assembler and packer. (*Id.*). Accordingly, ALJ Boyle found that claimant is not disabled. (*Id.*).

The ALJ's findings at steps two through four are contested. Claimant argues that the ALJ erred in his step two determination by failing to consider evidence of claimant's numerous impairments beyond spinal arthritis and GERD.[2] Claimant further argues that this omission flawed the ALJ's step three analysis in that the ALJ ignored an entire line of evidence favorable to claimant. Barrios also contends that the ALJ's RFC determination is incorrect because he did not undertake the function-by-function analysis of her physical limitations required by Social Security Ruling ("SSR") 96-8p. Finally, claimant alleges that the ALJ erred in his credibility determination and in concluding that claimant could perform her past relevant work.

We begin with Barrios' claim that ALJ Boyle erred by failing to consider relevant medical evidence.

## III.    DISCUSSION

### A.    The ALJ Failed to Articulate his Assessment of the Medical Evidence

Under the applicable regulations, the ALJ is required to explain the weight given to the opinions of Barrios' treating physicians. 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.") Generally, the opinions of a treating physician who is familiar with the claimant's impairments, treatments and response should be

---

[2]The issue at step two is whether the claimant's impairments, individually or collectively, are "severe." 20 C.F.R. §404.1520(a0(4)(ii). ALJ Boyle found that claimant met this threshold. Nevertheless, we will consider claimant's arguments in connection with our review of the ALJ's findings at step three.

given greater weight in disability determinations. *See Clifford*, 227 F.3d at 870 ("more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances.") (quotation omitted). If the ALJ does not give the opinions of claimant's treating physicians controlling weight, he is required to explain the weight given to the opinions of the medical examiner, consultant or other program physicians. 20 C.F.R. §404.1527(f)(2)(ii).

The ALJ relied on ME Manfredi's testimony that "[h]e did not believe that any Listing was met or equaled." (R. 13). ALJ Boyle later stated, in connection with his credibility analysis, that he gave "significant weight to the ME's opinion, including that the claimant can do light work, which was similar to the earlier opinions by the state agency consultants." He further stated that "[l]ittle or no weight is given to the much earlier opinion of a treating source, who opined that the claimant was deemed totally disabled from December 22, 2003, and onward due to arthritic complaints . . . [because] this opinion is not well supported by medical evidence." (R. 14).

Claimant argues that the ALJ did not adequately explain the basis for his reliance on ME Manfredi's conclusions, or his decision to give little weight to the opinions of Barrios' treating physicians, most notably Dr. Benages. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.") (citations omitted). We agree. Dr. Benages served as Barrios' treating physician prior to the onset of her alleged disability, and continued to provide treatment up to the date of the hearing before ALJ Boyle. As the Commissioner notes, some of Dr. Benages opinions, as well as those of Dr. Brown and

19

ME Manfredi, are consistent with the ALJ's findings. However, there is no indication that ALJ Boyle actually considered those opinions. Accordingly, remand is warranted. *See, e.g. Boiles v. Barnhart,* 395 F.3d 421, 426 (7th Cir. 2005) (remanding where ALJ "did not explain how other evidence in the record contradicted [the treating source]'s opinion"); *Scott v. Barnhart,* 297 F.3d 589, 596 (7th Cir. 2002)(holding that perfunctory consideration and analysis of the evidentiary record precludes meaningful judicial review of an ALJ's determination). On remand, the ALJ must clarify the weight given to the opinions of claimant's treating physicians.

Next, Barrios argues that the ALJ erred by failing to consider evidence of any impairment other than spinal arthritis and GERD. Specifically, Barrios contends that the ALJ ignored evidence of her neck, flank and shoulder pain; early disc degeneration; spinal osteophyte; knee pain; and pelvic pain and fibromyalgia. This argument is also persuasive.

ALJ Boyle must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quotation omitted); *see also Dixon*, 270 F.3d at 1176 (holding that an ALJ "must build an accurate and logical bridge from the evidence to [his] conclusion."). While the ALJ mentioned claimant's allegations of "neck pain, osteoarthritis, degenerative joint disease, cervical spondylosis, low back pain and bilateral knee pain," he did not articulate his analysis of that evidence. *See, e.g. Ray v. Bowen*, 843 F.2d 998, 1002-07 (7th Cir. 1988) (reasoning that an ALJ's failure to "articulate at some minimal level his analysis of the evidence" results in an undeveloped record that is insufficient for meaningful appellate review); *Diaz*, 55 F.3d at 307 (noting

that an ALJ may not discuss only that evidence which favors his ultimate conclusion).

On remand, the ALJ must consider claimant's relevant diagnosis and articulate his

reasons for accepting or rejecting that evidence. *See Barnett v. Barnhart,* 381 F.3d

664, 669 (7th Cir. 2004) (remanding where the ALJ ignored or misconstrued significant

parts of the medical record); *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984)

(noting that where the ALJ fails to mention rejected evidence, "the reviewing court

cannot tell if significant probative evidence was not credited or simply ignored.")

(quotation omitted).

### B.      The ALJ Must Explain his RFC Determination

Barrios also challenges ALJ Boyle's RFC determination. A claimant's RFC is

defined as "the most [the claimant] can do" in light of the alleged impairment and any

related symptoms, including pain which "may cause physical and mental limitations that

affect what [the claimant] can do in a work setting." 20 C.F.R. § 404.1545(a). In

determining a claimant's RFC, the ALJ must consider all of the medically determinable

impairments, including those which are not severe. 20 C.F.R. § 404.1545(b).

Claimant argues that reversal is warranted because "the ALJ fails to undertake a

function-by-function analysis of the claimant's physical limitations in violation of SSR 96-

8p." Pursuant to SSR 96-8p, a function-by-function analysis must be performed before

an ALJ can express a claimant's RFC in terms of the exertional levels of work, such as

sedentary, light, or medium. However, "the expression of a claimant's RFC need not be

articulated function-by-function; a narrative discussion of a claimant's symptoms and

medical source opinions is sufficient." *Knox v. Astrue*, 2009 U.S. App. LEXIS 13493,

*14 (7th Cir. June 19, 2009) (quotation omitted).

The Commissioner contends that the ALJ's RFC finding must be affirmed because it is supported by the opinions of ME Manfredi and Drs. Virgilio, Vidya and Brown.  However, the ALJ's RFC determination is primarily based on claimant's testimony.  (R. 13-14).  While Dr. Virgilio's prior RFC assessment is included in the administrative record, there is no basis for this Court to find that ALJ Boyle actually considered that assessment.  On remand, the ALJ must provide a narrative discussion of his conclusions, including his determination that claimant can perform her past relevant work.  *See Birsoce ex rel. Taylor v. Barnhart*, 425 F.3d 352-53 (7th Cir. 2005) (holding that the ALJ's failure to explain how he arrived at each conclusion is in itself sufficient to warrant reversal).

### C.     The ALJ's Credibility Determination is not Patently Wrong

Finally, Barrios contends that the ALJ erred in rejecting her credibility.  To succeed on this ground, claimant must overcome the highly deferential standard that we accord credibility determinations.  *See, e.g. Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (holding that the credibility determinations of hearing officers are afforded special deference).  Because the ALJ is in a superior position to assess the credibility of a witness, we will reverse an ALJ's credibility determination only if claimant can show that it was "patently wrong."  207 F.3d at 435.

ALJ Boyle found that Barrios' complaints "exceed the underlying pathology."  (R. 14).  He stated that claimant's "reported functional limitations are subjective and not supported by objective medical findings," and observed that she "takes minimal pain medication and uses no assistive device."  (*Id.*).  The ALJ also relied on claimant's own admission that she can lift fifteen pounds, stand for thirty minutes, and engages in some

household activities.  (R. 13-14).  Thus, the ALJ articulated his reasons for finding

claimant's subjective complaints were not entirely credible, and we cannot conclude that

his credibility determination was patently wrong.  *See Elder v. Astrue*, 529 F.3d 408,

413-14 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or

support that we will declare it to be patently wrong.") (quotations omitted).

## IV.    CONCLUSION

For the reasons stated above, Barrios' motion for summary judgment is granted

in part and denied in part,  the Commissioner's motion for summary judgment is denied,

and this case is remanded to the Social Security Administration for further proceedings

consistent with this opinion.  It is so ordered.

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: July 23, 2009**